# United States Court of Appeals
### Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia  30303

**John Ley**
Clerk of the Court

For rules and forms visit
www.ca11.uscourts.gov

October 12, 2010

Steven M. Larimore
Clerk, U.S. District Court
400 N MIAMI AVE RM 8N09
MIAMI  FL  33128-1813

FILED by ___ D.C.

OCT 1 5 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

**Appeal Number: 09-12683-DD**
Case Style: Martin Mulhall v. Unite Here Local 355
District Court Number:  08-61766 CV-PAS

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:
> Original record on appeal or review, consisting of: one volume

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

John Ley, Clerk of Court

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (06/2006)

# United States Court of Appeals
## For the Eleventh Circuit

No. 09-12683

District Court Docket No.
08-61766-CV-PAS

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Sep 10, 2010

JOHN LEY
CLERK

MARTIN MULHALL,

Plaintiff-Appellant,

versus

UNITE HERE LOCAL 355,
HOLLYWOOD GREYHOUND TRACK, INC.,
d.b.a.  Mardi Gras Gaming,

Defendants-Appellees.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

--------------------------------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
--------------------------------------------------------------

JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
OCT 1 2 2010
U.S. COURT OF APPEALS
ATLANTA GA

Entered:     September 10, 2010
For the Court:   John Ley, Clerk
By:     Patch, Jeffrey

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

|  |  |
|---|---|
| No. 09-12683 | FILED<br>U.S. COURT OF APPEALS<br>ELEVENTH CIRCUIT<br>SEPTEMBER 10, 2010 |
| D. C. Docket No. 08-61766-CV-PAS | JOHN LEY<br>CLERK |

MARTIN MULHALL,

Plaintiff-Appellant,

versus

UNITE HERE LOCAL 355,
HOLLYWOOD GREYHOUND TRACK, INC.,
d.b.a.  Mardi Gras Gaming,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Florida

(September 10, 2010)

Before BARKETT and MARCUS, Circuit Judges, and HOOD,[*] District Judge.

MARCUS, Circuit Judge:

---

[*] Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Martin Mulhall ("Mulhall"), an employee at the Hollywood Greyhound Track, Inc., d/b/a Mardi Gras Gaming ("Mardi Gras"), appeals from the district court's dismissal of his complaint against Mardi Gras and UNITE HERE Local 355 ("Unite"), a labor union, for violations of § 302 of the Labor Management Relations Act ("LMRA"). Mulhall sued Unite and Mardi Gras to enjoin enforcement of a Memorandum of Agreement ("MOA"), whereby Unite agreed to spend money in support of Mardi Gras' public campaign to obtain a gaming license, in exchange for Mardi Gras' assistance in making Unite the exclusive bargaining agent for Mardi Gras' currently non-unionized workforce. Appellant Mulhall, who vigorously opposes being unionized, claims that the organizing assistance promised by Mardi Gras violates § 302 of the LMRA, which makes it illegal for an employer to deliver, or for a union to receive, any "thing of value," subject to limited exceptions. 29 U.S.C. § 186(a)-(b). The district court dismissed Mulhall's complaint for lack of standing, holding that he lacked a cognizable injury. After thorough review, we conclude, however, that Mulhall has standing to prosecute this claim in federal court, and therefore that the case is justiciable. Accordingly, we reverse and remand for further proceedings.

I.

Mulhall's grievance stems from a Memorandum of Agreement concluded

2

between Mardi Gras and Unite on August 23, 2004.  The substance of the

agreement was as follows.  The local union, Unite, promised to lend financial

support to a ballot initiative regarding casino gaming that would benefit Mardi

Gras, and, if recognized as the exclusive bargaining agent for Mardi Gras'

employees, to refrain from picketing, boycotting, striking, or undertaking "other

economic activity" against Mardi Gras.[1]  In exchange, Mardi Gras promised to help

Unite organize the company's non-unionized workforce.  This assistance notably

included providing complete lists of Mardi Gras' employees, including their job

classifications, departments, and home addresses;[2] the use of Mardi Gras' property,

including non-public areas, for organizing;[3] a "neutrality agreement" (which

Mulhall calls a "gag clause") that prohibits any speech or actions by Mardi Gras or

---

[1] "During the life of this Agreement, the Union will not engage in a strike, picketing[,] or other economic activity at any gaming facility covered by this Agreement . . . ."  MOA ¶ 11. See also Complaint, ¶ 11 (describing promises of monetary and other support for ballot proposition concerning gaming).

[2] "Within ten (10) days following receipt of written notice of intent to organize Employees, the Employer will furnish the Union with a complete list of Employees, including both full and regular part-time Employees, showing their job classifications, departments[,] and addresses.  Thereafter, the Employer will provide updated complete lists monthly, or at a longer period of time if the Union does not request the lists monthly."  MOA ¶ 8.

[3] "If the Union provides written notice to the Employer of its intent to organize Employees covered by this Agreement, the Employer shall provide access to its premises and to such Employees by the Union. The Union may engage in organizing efforts in non-public areas of the gaming facility during Employees' non-working times (before work, after work, and during meals and breaks) and/or during such other periods as the parties may mutually agree upon." MOA ¶ 7.

3

its agents that state or imply opposition to the union;[4] a waiver of Mardi Gras' right

to seek NLRB-supervised secret elections to verify the union's majority status, and

an agreement to abide by a less formal "card-check" procedure instead;[5] and a

promise not to file unfair labor practice charges against Unite for violations of

employee rights during the union's organizing campaign.[6]

Pursuant to the MOA, Unite spent over $100,000 campaigning for the

gaming-related ballot initiative favored by Mardi Gras.  Thereafter, in May and

July 2008, Unite sent Mardi Gras written notices of its intent to organize Mardi

Gras' employees, and demanded that Mardi Gras provide the organizing assistance

promised in the MOA.  Mardi Gras, however, refused to provide the assistance,

claiming, with the advice of new legal counsel, that the MOA was illegal and

---

[4] "The Employer will take a neutral approach to unionization of Employees. The Employer will not do any action nor make any statement that will directly or indirectly state or imply any opposition by the Employer to the selection by such Employees of a collective bargaining agent, or preference for or opposition to any particular union as a bargaining agent." MOA ¶ 4.

[5] "The Union may request recognition as the exclusive collective bargaining agent for Employees. The Arbitrator selected through the procedures set out [herein], or another person mutually agreed to by Employer and Union, will conduct a review of Employees' authorization cards and membership information submitted by the Union in support of its claim to represent a majority of such Employees. If that review establishes that a majority of such Employees has designated the Union as their exclusive colletive bargaining representative or joined the Union, the Employer will recognize the union as such representative of such Employees. The Employer will not file a petition with the National Labor Relations Board for any election in connection with any demand for recognition provided for in this agreement." MOA ¶ 9.

[6] "The Union and the Employer will not file any charges with the National Labor Relations Board in connection with any act or omission occurring within the context of this agreement; arbitration . . . shall be the exclusive remedy." MOA ¶ 9.

unenforceable.

Unite responded in late September 2008 by filing a petition to compel

arbitration, pursuant to the MOA's arbitration clause, in the United States District

Court for the Southern District of Florida. See Unite HERE Local 355 v.

Hollywood Greyhound Track, Inc., Case No. 08-61655-PAS (S.D. Fla. 2008).[7]

Unite requested enforcement of the MOA, but also made clear that if the MOA

were found unlawful, it would "request restitutionary damages from the arbitrator

or court based on quantum meruit for the time and money the Union and its

members spent on the political campaign to obtain a gaming license for Mardi Gras

(estimated at over $100,000) and over $100,000 in business which Mardi Gras

would have lost from a boycott." Joint Scheduling Rpt., February 23, 2009, at *2.

Mardi Gras filed an answer and counterclaimed for a declaration that the MOA was

invalid.

On April 15, 2009, the district court entered an order compelling arbitration

of the parties' dispute, including Mardi Gras' claim that the MOA was

unenforceable. The matter was arbitrated, and on August 6, 2009, an arbitrator

returned a ruling in favor of Unite, finding the MOA enforceable and requiring

Mardi Gras to provide the requested organizing assistance. Mardi Gras then

---

[7] Unite named Mardi Gras as the sole respondent, and Mulhall has never been a party to
Unite's separate lawsuit against Mardi Gras.

moved the district court to vacate the award, and Unite moved to confirm it. <u>See</u>
Hollywood Greyhound Race Track, Inc. v. Unite HERE Local 355, Case No. 09-
61760-WJZ (S.D. Fla. 2009). The district court denied Mardi Gras' motion and
confirmed the award in most material respects. The court granted Mardi Gras'
motion to vacate the award only insofar as the arbitrator had unilaterally extended
the terms of the MOA by one year, apparently as an equitable remedy for Mardi
Gras' breach in failing to provide the contractually promised organizing assistance.
<u>See</u> Hollywood Greyhound Race Track, Inc. v. Unite HERE Local 355, Case No.
09-61760-Zloch (S.D. Fla. 2009) (Order granting in part and denying in part
motions to vacate and to confirm arbitration award, at 6).

All the while, Mulhall was pursuing his own effort to block enforcement of
what he characterized as an illegal and collusive arrangement between a union and
an employer. Not long after Mardi Gras filed its counterclaim for declaratory
relief, Mulhall filed his own action (the instant case) seeking an injunction
pursuant to § 302(e) of the LMRA, 29 U.S.C. § 186(e), claiming that the MOA
violated § 302(a)-(b) of the statute. On April 22, 2009, one week after ordering
Mardi Gras and Unite to arbitrate the validity of the MOA, the district court
dismissed Mulhall's complaint for lack of standing, holding that he had failed to
show an injury-in-fact that was "actual or imminent," since it was possible that he

6

would never be unionized even if Unite received all of the specified organizing assistance from the Hollywood Greyhound Track.

Mulhall timely filed this appeal, claiming to have both Article III and prudential standing to seek to enjoin the MOA pursuant to § 302. Unite disagrees, and also says that Mulhall's claim is not ripe for review because Mardi Gras has refused to provide organizing assistance, and may never do so.

## II.

### A.

We consider first whether Mulhall has Article III standing. As the party invoking federal jurisdiction, Mulhall bears the burden of demonstrating his standing to sue. Pittman v. Cole, 267 F.3d 1269, 1282 (11th Cir. 2001). To do so, he must show that: (1) he has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the defendants' conduct; and (3) a favorable judgment is likely to redress the injury. Harrell v. The Florida Bar, 608 F.3d 1241, 1253 (11th Cir. 2010). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)

7

(quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990)).[8] Whether

Mulhall has standing to seek an injunction of the MOA pursuant to § 302 is a legal

issue subject to de novo review. Region 8 Forest Serv. Timber Purchasers Council

v. Alcock, 993 F.2d 800, 806 (11th Cir. 1993).

To demonstrate an injury-in-fact, Mulhall is required to show that he has a

legally cognizable interest that has been or is imminently at risk of being invaded.

Lujan, 504 U.S. at 560. This requirement merely ensures that Mulhall, like any

plaintiff, "has 'alleged such a personal stake in the outcome of the controversy as

to assure that concrete adverseness which sharpens the presentation of issues.'"

Flast v. Cohen, 392 U.S. 83, 99 (1968) (quoting Baker v. Carr, 369 U.S. 186, 204

(1962)). Importantly, therefore, the relevant question is not whether Mulhall has a

legal right to be free from involuntary unionization, or is legally entitled to enjoin

the MOA. "[S]tanding in no way depends on the merits of the plaintiff's

contention that particular conduct is illegal," Warth v. Seldin, 422 U.S. 490, 500

(1975); it "focuses on the party seeking to get his complaint before a federal court

---

[8] Although a court may consider materials beyond the pleadings if the defendant has mounted a factual attack on subject-matter jurisdiction, there is no suggestion in this record that the defendant has done so, and we consider this to be a facial attack. A plaintiff defending against a facial attack on jurisdiction enjoys "safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised," and both the district court and a reviewing court "must consider the [well-pleaded] allegations in the plaintiff's complaint as true." McElmurray v. Consol. Gov't of Augusta-Richmond County, 501 F.3d 1244, 1251 (11th Cir. 2007) (emphasis added) (citations omitted).

8

and not on the issues he wishes to have adjudicated," Flast, 392 U.S. at 99. At issue today is only whether Mulhall has a stake in this controversy that is real enough and concrete enough to entitle him to be heard in a federal district court concerning his § 302 claim, nothing more.

Mulhall has a cognizable associational interest under the First Amendment to challenge the alleged collusive arrangement between the employer and the union under § 302. If Unite is certified as the majority representative of Mardi Gras' employees, Mulhall will have been thrust unwillingly into an agency relationship, where the union is his "exclusive representative[] . . . for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment" under § 9(a) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 159(a). This arrangement creates a fiduciary relationship, akin to that between a trustee and beneficiary. See Chauffeurs, Teamsters, and Helpers, Local 391 v. Terry, 494 U.S. 558, 567 (1990). Moreover, regardless of whether Mulhall can avoid contributing financial support to or becoming a member of the union, cf. Fla. Const. art. I, § 6 ("The right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization."), its status as his exclusive representative plainly affects his associational rights. His views, for example, like those of any

9

employee, may be at variance with

> a wide variety of activities undertaken by the union in its role as exclusive representative.  His moral or religious views about the desirability of abortion may not square with the union's policy in negotiating a medical benefits plan. One individual might disagree with a union policy of negotiating limits on the right to strike, believing that to be the road to serfdom for the working class, while another might have economic or political objections to unionism itself.  An employee might object to the union's wage policy because it violates guidelines designed to limit inflation, or might object to the union's seeking a clause in the collective-bargaining agreement proscribing racial discrimination. The examples could be multiplied.

Abood v. Detroit Bd. of Ed., 431 U.S. 209, 222 (1977).  Thus, it has long been recognized that such "association for the purpose of advancing economic, as well as political or religious, interests falls within the protection of the First Amendment." Scott v. Moore, 680 F.2d 979, 990 (5th Cir.1982) (en banc), rev'd on other grounds sub nom. United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott, 463 U.S. 825 (1983) (citing Bhd. of R.R. Trainmen v. Virginia, 377 U.S. 1, 8 (1964), Thomas v. Collins, 323 U.S. 516, 531 (1945), and Abood, 431 U.S. at 222)).

Just as "[t]he First Amendment clearly guarantees the right to join a union," Hobbs v. Hawkins, 968 F.2d 471, 482 (5th Cir. 1992) (citing Thomas, 323 U.S. at 532), it "presupposes a freedom not to associate" with a union, Roberts v. U.S . Jaycees, 468 U.S. 609, 623 (1984) (citing Abood, 431 U.S. at 234-235). This

10

freedom of course may be outweighed by other important governmental interests, such as the promotion of productive labor-management relations.  In this instance, for example, although the federally-created right of a majority-favored union to supersede an employee's direct bargaining relationship with his employer amounts to "compulsory association," Acevedo-Delgado v. Rivera, 292 F.3d 37, 42 (1st Cir. 2002), that compulsion "has been sanctioned as a permissible burden on employees' free association rights," id., based on a legislative judgment that collective bargaining is crucial to labor peace, Abood, 431 U.S. at 224.

The relevant point here, however, is that employees like Mulhall have such an associational interest.  See Scott, 680 F.2d at 990 (holding that First Amendment interests of nonunion employees to work in nonunion environment were invaded by pro-union conspiracy); see also Rivera, 292 F.3d at 42.  In other words, while "compulsory affiliation with . . . [a] union does not, without more, violate the First Amendment rights" of employees, Lehnert v. Ferris Faculty Ass'n, 500 U.S. 507, 517 (1991) (addressing both private- and public-employer contexts), it is no less true that "compelling an employee . . . to belong to . . . a union . . . implicates that person's First Amendment right not to associate," Romero v. Colegio De Abogados De P.R., 204 F.3d 291, 301 (1st Cir. 2000) (emphasis

added).[9]  We conclude that Mulhall has a legally cognizable associational interest.
We do not purport to assess the strength of Mulhall's interest; we say only that it is
enough to allow him to get his ticket stamped for admission to the federal court in
order to be able to argue that the arrangement between Mardi Gras and Unite is
illegal under § 302.

Mulhall has also adequately alleged that this associational interest is at
imminent risk of invasion, because Mardi Gras' provision of considerable and
varied organizing assistance pursuant to the MOA will substantially increase the
likelihood that Mulhall will be unionized against his will.  Under controlling law, a
plaintiff faces an "imminent" harm when there is "a realistic danger of sustaining a
direct injury as a result" of the challenged action.  Fla. State Conf. of NAACP v.
Browning, 522 F.3d 1153, 1161 (11th Cir. 2008) (quoting Babbitt v. United Farm
Workers Nat'l Union, 442 U.S. 289, 298 (1979)).  "How likely is enough is
necessarily a qualitative judgment," id., but, under our law, "probabilistic harm is
enough injury in fact to confer standing in the undemanding Article III sense," id.
at 1163 (citation and alteration omitted).

Mulhall has adequately alleged that the organizing assistance promised by

---

[9] Indeed, even if Mulhall's associational interest were characterized as being primarily
commercial in nature, his interest would still be entitled to protection under the First
Amendment, albeit to a lesser extent.  See Roberts v. U.S. Jaycees, 468 U.S. 609, 634 (1984)
(O'Connor, J., concurring).

12

Mardi Gras in the MOA is valuable, and indeed essential, to Unite's effort to gain recognition.  As an initial matter, the complaint says that the provision of lists showing the classifications, departments, and home addresses of Mardi Gras' employees "permits Local 355 to target employees during organizing campaigns and send union organizers to employees' homes," Complaint ¶ 17(b); that access to Mardi Gras' facilities, including "non-public areas of the gaming facility" during non-working hours, "is objectively useful to Local 355 for organizing nonunion employees," id. ¶ 20(b); that the neutrality agreement is also useful to Local 355 because, among other things, it silences potentially persuasive opponents of unionization within the company, including all managers and supervisors who otherwise might discuss the disadvantages of unionization, id. ¶ 25(b); and that Mardi Gras' waiver of its right to demand a secret, NLRB-conducted election, Complaint, ¶ 10(a) -- a method which has "acknowledged superiority in ascertaining whether a union has majority support," Linden Lumber Division, Summer & Co. v. NLRB, 419 U.S. 301, 304 (1974) -- similarly figured into the quid pro quo exchange with Unite, id. ¶ 11.

The complaint in this case, moreover, highlights Unite's own belief that the employer's organizing assistance is essential to its effort to gain majority status. The complaint contains the following quotation from Unite's own allegations in

13

parallel litigation:

> [T]he Employer's failure to abide by the Agreement's provisions has caused and will cause serious irreparable injuries to the Union and its members. Without a list the Union is unable to provide information to many of the Employer's workers, and hence unable to obtain recognition as the employees' representative as contemplated by Section 9 of the Agreement, and unable to find out from workers whether the Employer is complying with other provisions of the Agreement. . . . The resulting delay in recognition means a delay in obtaining the financial benefits of union representation for employees, and increased organizing expenses and lost revenues for the Union, but the amount of such damages is extraordinarily burdensome to calculate, and also there are non-financial advantages to recognition which cannot be put into monetary terms. The Union is also suffering irreparable injuries in loss of standing with employees and loss of bargaining power.

Complaint ¶ 27 (quoting Unite HERE Local 355 v. Hollywood Greyhound Track, Inc., Case No. 08-61655-PAS (S.D. Fla.) (Complaint ¶ 11)). Also noteworthy, of course, is the consideration Unite offered for the organizing assistance: it promised not to "picket, boycott, strike, or take other economic action against Mardi Gras," and that it would "expend monetary and other resources" to support a ballot proposition favored by Mardi Gras. Id. ¶ 11. Unite ultimately spent $100,000 on the initiative campaign, suggesting that the organizing assistance it bargained for was significant in a monetary sense.

Taken together, the allegations in Mulhall's complaint yield a strong inference that the organizing assistance is a critical ingredient for Unite's success,

14

and that, if provided, it will substantially increase the likelihood that Mulhall will be unionized against his will. That "probabilistic harm" is a cognizable injury for purposes of standing. Browning, 522 F.3d at 1163.[10]

For obvious reasons, Mulhall's claim also satisfies the causation element of the standing inquiry. Mulhall's claimed injury flows from Mardi Gras' imminent provision of organizing assistance under the MOA, in response to Unite's demands. This injury is "fairly traceable" to the defendants' conduct. Lujan, 504 U.S. at 560 (alteration omitted).

---

[10] On appeal, Mulhall cites a number of academic authorities in support of his contention that the organizing assistance and other concessions by Mardi Gras in the MOA substantially increase the likelihood that Unite will achieve majority recognition. See, e.g., Laura J. Cooper, Privatizing Labor Law: Neutrality/Card Check Agreements and the Role of the Arbitrator, 83 Ind. L.J. 1589, 1591-93 (2008) (noting that "all indications" in empirical research are that "neutrality/card check agreements [are] . . . a remarkably successful mechanism" in achieving recognition; explaining that neutrality agreements ban many lawful employer tactics thought to contribute to union representation election losses, including captive audience speeches, "aggressive and hierarchical" employer communications, and "intense personal campaigning by supervisors" (citation omitted); and observing that it is unclear "why a non-union employer might be willing to contract with a stranger union to forego lawful campaign tactics and a government-conducted secret-ballot election, both of which would enhance its chances of remaining union-free," except as a result of "rational business judgment"); Charles I. Cohen, Joseph E. Santucci, Jr. & Jonathan C. Fritts, Resisting its Own Obsolescence -- How the National Labor Relations Board is Questioning the Existing Law of Neutrality Agreements, 20 Notre Dame J.L. Ethics & Pub. Pol'y 521, 523 (2006) (noting that neutrality agreements, employee lists, and access to employer facilities "significantly increase the chances that an organizing drive will be successful"); Adrienne E. Eaton & Jill Kriesky, Union Organizing under Neutrality and Card Check Agreements, 55 Indus. & Lab. Rel. Rev. 42, 57 (2001) (finding strong evidence that "[c]ard check agreements . . . substantially increased the rate of union recognition" as compared with NLRB-conducted secret elections, and that "[r]equirements that employers provide unions with employee lists and time limits to campaigns were both associated with greater union success"). This material, however, is neither part of the pleadings, nor subject to judicial notice, nor included in any affidavits or attachments to the pleadings, so we do not consider it in resolving this facial attack on subject-matter jurisdiction.

Finally, Mulhall's allegations satisfy the redressability requirement. "Redressability is established . . . when a favorable decision 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" Harrell, 608 F.3d at 1260 n.7 (citation omitted). If Mulhall obtains a judgment enjoining enforcement of the MOA, the substantial increase in the risk of unionization attributable to the MOA will have been eliminated.

## B.

Unite Local 355 also appears to suggest that Mulhall's claim is barred by the prudential standing doctrine, which comprises three non-constitutional, non-jurisdictional, policy-based limitations on the availability of judicial review. Am. Iron and Steel Inst. v. OSHA, 182 F.3d 1261, 1274 n.10 (11th Cir. 1999). The doctrine requires (1) that the plaintiff's complaint fall within the "zone of interests" protected by the statute or constitutional provision at issue; (2) that the complaint not require the court to pass on abstract questions or generalized grievances better addressed by the legislative branches; and (3) that the plaintiff assert his or her own legal rights and interests rather than the legal rights and interests of third parties. Harris v. Evans, 20 F.3d 1118, 1121 (11th Cir.1994) (en banc). Mulhall easily satisfies the second and third requirements. The only real dispute here is

16

whether Mulhall meets the "zone-of-interests" test, which limits judicial review to claims of injury that are sufficiently related to the core concerns of a given statute.

The zone-of-interests test "does not require the plaintiff to show an identifiable 'legal interest' that may entitle him to relief." Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater, 2 F.3d 1514, 1526 (11th Cir. 1993) (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp ("ADAPSO"), 397 U.S. 150, 153 (1970)). Rather, the plaintiff need only show "that the relationship between [his] alleged interest and the purposes implicit in the substantive provision [is] more than 'marginal[],'" City of Clearwater, 2 F.3d at 1526 (quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987)). See also ADAPSO, 397 U.S. at 153.

The relationship between Mulhall's alleged interest and the purposes of § 302 is more than "marginal." Section 302 is "a conflict-of-interest statute," United States v. Browne, 505 F.3d 1229, 1248 (11th Cir. 2007); it bans the exchange of anything of value between a union and an employer, subject to a strictly limited set of exceptions, see 29 U.S.C. § 186(a)-(c). Its purpose is to "protect employees in dealings between the union and employer," Jackson Purchase Rural Elec. Coop. Ass'n v. Local Union 816, Int'l Bhd. of Elec. Workers, 646 F.2d 264, 267 (6th Cir. 1981), and specifically to protect them "from the collusion of union officials and management," Mosley v. Nat'l Maritime Union Pension and Welfare Plan, 438 F.

17

Supp. 413, 421 (E.D.N.Y. 1977). Indeed, the legislative history of § 302

demonstrates that the provision was intended to "prohibit[ ], among other things,

the buying and selling of labor peace," see S. Rep. No. 98-225 (1984), reprinted in

1984 U.S.C.C.A.N. 3182, 3477, something that the MOA at issue here at least

arguably does, see Complaint ¶ 11; MOA ¶ 11. Mulhall's complaint thus falls

within the zone of interests that § 302 was designed to protect.

In sum, Mulhall has adequately pleaded facts supporting Article III standing,

and his claim raises no prudential standing concerns.

## III.

Unite next argues that Mulhall's claim is not ripe, because his alleged injury

is contingent on the outcome of Mardi Gras' own lawsuit against Unite to void the

MOA. Specifically, Unite suggests that Mardi Gras' lawsuit, if successful, would

shield Mulhall from the agreement's allegedly illegal effects, and from the

concomitant increase in the likelihood of unionization. We remain unpersuaded.

The ripeness doctrine is one of the several "strands of justiciability doctrine .

. . that go to the heart of the Article III case or controversy requirement." Harrell,

608 F.3d at 1246 (quotation marks and citation omitted). While standing concerns

the identity of the plaintiff and asks whether he may appropriately bring suit,

ripeness concerns the timing of the suit. Id. at 1261. The function of the ripeness

18

doctrine is to "protect[] federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." Id. at 1257-58 (citation and quotation marks omitted). "To determine whether a claim is ripe, we assess both the fitness of the issues for judicial decision and the hardship to the parties of withholding judicial review." Id. at 1258 (emphasis omitted). "The fitness prong is typically concerned with questions of 'finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed.'" Id. (citation and quotation marks omitted). "The hardship prong asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal." Id.

Unite's argument, which goes to the "fitness" prong of the ripeness inquiry, has some appeal, for it is generally true that the existence of contingencies raises fitness concerns that "militat[e] in favor of postpon[ing]" review. Id. at 1263 (quoting AT&T Corp. v. FCC, 349 F.3d 692, 700 (D.C. Cir. 2003)). Specifically, if a plaintiff's claimed injury depends on the resolution of other judicial proceedings, there may well be fitness concerns that render the plaintiff's claim presumptively unripe. See, e.g., In re Lowenschuss, 170 F.3d 923, 932 (9th Cir. 1999) (holding that claim in bankruptcy dependent on judgment in parallel proceedings in New Jersey was unripe, where Third Circuit had not yet ruled on an

appeal); <u>Lincoln House, Inc. v. Dupre</u>, 903 F.2d 845 (1st Cir. 1990).[11]

Yet, to determine whether a future contingency creates fitness (and ultimately ripeness) concerns, a court must assess the <u>likelihood</u> that a contingent event will deprive the plaintiff of an injury. <u>See</u> <u>Pittman</u>, 267 F.3d at 1278. In other words, it is not merely the existence, but the "<u>degree</u> of contingency [that] is an important barometer of ripeness." <u>Riva v. Massachusetts</u>, 61 F.3d 1003, 1011 (1st Cir. 1995) (emphasis added). <u>See also</u> <u>United Steelworkers of Am., Local 2116 v. Cyclops Corp.</u>, 860 F.2d 189, 194 (6th Cir. 1988) ("In undertaking a ripeness analysis, we . . . . pay particular attention to the likelihood that the harm alleged by plaintiffs will ever come to pass.").

In this case, it is extremely unlikely that Mardi Gras' parallel litigation, in its present posture, will deprive Mulhall of an injury. As recounted above, the district court granted Unite's motion to compel arbitration of the dispute over the validity of the MOA, and the arbitrator rendered a judgment in favor of Unite. Mardi Gras moved to vacate the award, but the district court confirmed the award in all

---

[11] The "fitness" issue raised by the existence of future contingencies, which goes to ripeness, is related to but distinct from the "imminence" requirement of a cognizable injury-in-fact, which goes to standing. The question, for purposes of standing, is how likely the challenged conduct is to cause the plaintiff an injury. The question for ripeness purposes is whether the defendant's <u>engagement</u> in the challenged conduct is contingent on future events whose non-occurrence might deprive the plaintiff of an injury-in-fact. <u>See</u> <u>Bova v. City of Medford</u>, 564 F.3d 1093, 1096 (9th Cir. 2009) (noting that ripeness and standing are interrelated, insofar as non-occurring future events will deprive the plaintiff of an injury-in-fact).

respects but one.  Thus, despite its long-standing unwillingness to comply with the disputed provisions of the MOA, Mardi Gras is <u>now</u> under compulsion of the law to do just that.

We can divine only one theoretical scenario in which Mulhall could be deprived of an injury at this point, namely, if Mardi Gras appealed the district court's order confirming the arbitration award, obtained a stay of the district court's judgment pending appeal, <u>and</u> prevailed on appeal.  But that scenario is a decidedly remote possibility under the circumstances, because Mardi Gras is very unlikely to succeed in an appeal of the judgment confirming the arbitration award. The Federal Arbitration Act authorizes a federal court to vacate an arbitral award in only four instances:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. §§ 10(a); Frazier v. CitiFinancial Corp., LLC, 604 F.3d 1313, 1321, 1324 (11th Cir. 2010) (holding that statutory grounds for vacatur are exclusive). Aside from its claim that the arbitrator exceeded his authority by extending the term of the MOA for one year -- a claim upon which the district court granted relief -- Mardi Gras never argued that the arbitral award was subject to vacatur on any of the enumerated statutory grounds.

Furthermore, although Mardi Gras might argue on appeal that the validity of the MOA should not have been arbitrated in the first instance, Mardi Gras is very unlikely to prevail on that claim, either. As the district court observed in granting Unite's motion to compel arbitration, federal law required arbitration of the subject dispute, pursuant to the MOA's arbitration clause, "unless it [could] be said with positive assurance that the arbitration clause [was] not susceptible of an interpretation that cover[ed] the asserted dispute," with any doubts about arbitrability resolved "in favor of coverage." AT&T Techs. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) (citations omitted). The clause at issue here broadly covered "any disputes over the interpretation or application of" the MOA, a phrase that seems at least arguably expansive enough to cover a dispute over whether certain parts of the agreement were legal and could be applied at all.

It is also exceedingly unlikely that Mardi Gras could successfully obtain a

22

stay of the district court's judgment confirming the arbitral award pending appeal. To be sure, a stay is theoretically (and procedurally) possible: "[a]rbitration awards are not self-enforcing, [but] . . . must be given force and effect by being converted to judicial orders" on an appropriate motion to confirm or vacate, D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 104 (2d Cir. 2006) (internal quotation marks omitted), and a district court may enter a stay of any judgment pending an appeal, see Fed. R. Civ. P. 62, including a judgment upon an order confirming or vacating an arbitral award. Yet, in ruling on a requested stay, the district court first would have to assess the appellant's likelihood of success on appeal. See Venus Lines Agency v. CVG Industria Venezolana de Aluminio, C.A., 210 F.3d 1309, 1313-14 (11th Cir. 2000).[12] As we see it, the likelihood that Mardi Gras will succeed in any appeal is minimal due to the constraints of the arbitration system, and the additional likelihood of a stay is correspondingly low.

In short, the contingency, if any, occasioned by Mardi Gras' parallel litigation to void the MOA is very remote. Thus, Mulhall's claim raises no substantial fitness concerns. And, "'[w]here . . . there are no significant agency or

---

[12] The likelihood of success is one factor a district court must consider when ruling on a requested stay. The other factors are: whether, absent a stay, the movant will suffer irreparable damage; whether the adverse party will suffer no substantial harm from issuance of a stay; and whether the public interest will be served by issuing a stay. Venus Lines Agency v. CVG Industria Venezolana de Aluminio, C.A., 210 F.3d 1309, 1313-14 (11th Cir. 2000).

23

judicial interests militating in favor of delay, [lack of] 'hardship' cannot tip the balance against judicial review.'" Harrell, 608 F.3d at 1259 (quoting Consol. Rail Corp. v. United States, 896 F.2d 574, 577 (D.C. Cir. 1990)). Accordingly, Mulhall's claim is ripe for review, too.

IV.

Beyond the issues of standing and ripeness, the parties have extensively briefed the merits question of whether § 302 provides a claimant like Mulhall with a private right of action, as well as the question of whether the organizing assistance specified in the MOA actually violates § 302 of the LMRA. Neither question, however, is properly before us on review of the district court's order dismissing this action for lack of subject-matter jurisdiction.

The existence of a private right of action is an issue "separate and distinct" from the issue of standing, The Wilderness Society v. Kane County, Utah, 581 F.3d 1198, 1215 (10th Cir. 2009), and "is not jurisdictional," Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355, 365 (1994). See also Air Courier Conference of Am. v. Am. Postal Workers Union, AFL-CIO, 498 U.S. 517, 523, n.3 (1991). Although the district court mentioned in passing that § 302 provides a private right of action, Mulhall v. Unite HERE Local 355, et al., No. 08-61766-PAS (S.D. Fla. April 22, 2009) (Order granting motion to dismiss, at 3), and

24

although the Supreme Court has observed in dicta that § 302(e) "expressly permit[s] suits for injunctions . . . to be brought in the federal courts by private litigants," Sinclair Ref. Co. v. Atkinson, 370 U.S. 195, 205 n.19 (1962), the issue is simply not for us to decide in this appeal.

Similarly, the question of whether the disputed organizing assistance is a "thing of value," whose provision by Mardi Gras or acceptance by Unite would violate § 302, is beyond the scope of this appeal. "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." Warth, 422 U.S. at 500. The merits will be for the district court to decide on remand.

V.

In sum, we conclude that Mulhall has constitutional and prudential standing to maintain his claim for injunctive relief under § 302 of the Labor Relations Management Act, and that his claim is ripe for review. Accordingly, we reverse the district court's order and judgment of dismissal and remand the case for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

A True Copy Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By:_____
Deputy Clerk
Atlanta, Georgia